Town of Greenburgh, Appellant, *v.* Westchester Lighting Company, Respondent.   (Action No. 2.)

Second Department, June 25, 1926. .

Gas and electricity — action to restrain defendant from maintaining and continuing gas tank or holder in plaintiff town — gas tank is not manufactory or place of business dangerous to life or detrimental to health within meaning of ordinance — ordinance passed after defendant's gas tank was erected and in operation is unwarranted exercise of police power.

A gas tank or holder erected by the defendant in the plaintiff town, the maintenance and continuance of which is sought to be restrained by this action, is not a manufactury or place of business dangerous to life or detrimental to health within the meaning of an ordinance of the plaintiff town requiring a permit from the board of health for its erection and maintenance. The gas tank or holder used only for the storage of gas which is manufactured at another place, and the boiler room maintained in connection therewith cannot be considered either as a manufactory or as a place of business.

But, assuming that the defendant's gas tank and boiler room constituted a place of business, the evidence fails to show that its operation will be dangerous to life or detrimental to health or that it will generate unwholesome, offensive or deleterious odors, gas, smoke, deposit or exhalations.

An ordinance passed after defendant's gas tank was erected and in operation which prohibits the erection of a gas tank so near a parkway or highway, public school or residential district as to be dangerous to life and limb in the event of explosion or so close to homes or residences as to impair either light, air and free access, is void and an unwarranted exercise of the police power, and is discriminatory in so far as it prohibits the erection of a gas tank that will impair the light, air and free access to homes or residences.

Appeal by the plaintiff, Town of Greenburgh, from a final judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Westchester on the 28th

day of August, 1925, upon the decision of the court rendered after a trial at the Westchester Special Term.

*Julius Henry Cohen* [*Bernard Hershkopf* and *Ernest F. Griffin* with him on the brief], for the appellant.

*Henry R. Barrett* [*John A. Garver* and *Chauncey B. Garver* with him on the brief], for the respondent.

Manning, J. The plaintiff appeals from judgments dismissing complaints in two actions that were tried together at Special Term in White Plains. The relief sought in both actions was to restrain and enjoin the defendant, a domestic public service corporation, operating in Westchester county, from maintaining or continuing the gas tank or holder erected on its premises adjacent to the Tarrytown-White Plains road in the town of Greenburgh.

The construction of the gas holder in question was begun in August, 1923. The first action to prevent the construction or the continuance of the holder was commenced on November 30, 1923.

The complaint alleges the existence of " Ordinances in the Form of a Code, comprising the plumbing and drainage regulations in the Town of Greenburgh." The ordinance was passed in February, 1923. It provides for the examination, registration, licensing and bonding of master plumbers, and for other sanitary regulations. It is made part of the complaint in the first action. Most of its provisions relate to plumbing in the sense that the word is generally understood, and they have no bearing upon the maintenance of a gas holder as such. The only part of the defendant's plant to which these plumbing regulations could be said to apply is a single toilet in the boiler house upon the premises, and there is nothing to show that this was or is more offensive or more dangerous than the plumbing connections in a private home. The only provisions of the ordinance which could be regarded as applying to the gas holder are sections 174, 175 and 199, which read as follows:

" Sec. 174. No person shall permit or have any offensive substance, water or other liquid, whether refuse or for use in any trade or otherwise, on his premises to the prejudice of life or health; or throw, deposit, or allow to run or be thrown into or upon any street or public place, pond, or stream any offensive, or deleterious liquid, gas, or solid, or any offensive matter whatsoever; or foul or render impure any natural stream of water in any manner which may be prejudicial to health; and every refiner or manufacturer of any produce whatsoever shall use the most approved and all reasonable and proper means to prevent the escape of smoke, gases and odors from his premises. Any person violating any of

the provisions of this ordinance shall be liable to a penalty of fifty dollars.

"Sec. 175. No person or company shall erect or maintain any manufactory or place of business dangerous to life or detrimental to health or where unwholesome, offensive or deleterious odors, gas, smoke, deposit or exhalations are generated, without the permit of the Board of Health, and all such establishments shall be kept clean and wholesome so as not to be offensive or prejudicial to public health; nor shall any offensive or deleterious waste-substance, gas-tar, sludge, refuse or injurious matter be allowed to accumulate upon the premises or be thrown or allowed to run into any public waters, streams, watercourse, or public place. And every person or company conducting such manufacture or business shall use the best approved and all reasonable means to prevent the escape of smoke, gases and odors, and to protect the health and safety of all operatives employed therein. Any violation of the provisions of this ordinance shall subject the offending person to a penalty of fifty dollars for each offense. * * *

"Sec. 199. Whatever is dangerous to human life or health; whatever building, or part or cellar thereof, is overcrowded or not provided with adequate means of ingress and egress, or is not sufficiently supported, ventilated, sewered, drained, lighted or cleaned; and whatever renders soil, air, water or food impure or unwholesome, are declared to be nuisances and to be illegal; and every person having aided in creating or contributing to the same, or who may support, continue or retain any of them, shall be deemed guilty of a violation of this ordinance and shall also be liable for the expense of the abatement or remedy required."

The complaint alleges that the defendant's "property and vicinity are drained by streams which flow through the farms, [from] which streams the cattle of said farms are watered;" that the holder being erected "will be 125 feet in diameter and 42 feet high," and "is to be filled with water and gas and drained by an overflow pipe;" that the holder will "generate offensive and deleterious odors and will be a hazard to life and health;" that, upon information and belief, the "tarry products or waste of said tank will be discharged into the streams in the vicinity and will thereby contaminate said streams;" that the defendant has never applied or received a permit from the board of health of the town of Greenburgh for the erection and maintenance of the holder, and, if erected, it would be in violation of the provisions of the ordinance.

A board of health permit must be obtained by any person who shall maintain a manufactory or place of business which is

" dangerous to life or detrimental to health or where unwholesome, offensive or deleterious odors, gas, smoke, deposit or exhalations are generated."

The defendant claims that neither the gas holder nor the plant maintained in connection with it is a " manufactory " or a " place of business," and that, therefore, the provisions of section 175 do not apply. With this I am inclined to agree. The plant is not used for the manufacture of gas or of anything else. The holder is used only for the storage of gas manufactured at some other place. One of plaintiff's witnesses was asked to explain the difference between a " complete " plant, where gas is manufactured, and the plant in question, and he replied: " Such a complete plant is this holder and this power house plus the manufacturing works." Nor do I think it can be said to be a place of business in the sense in which that term is generally used. The appellant cites *Washington Gas Co.* v. *Dist. of Columbia* (161 U. S. 316, 325) as authority for its claim that a place where gas is stored is a place of business within the meaning of the regulation. That case, as I read it, is not such authority. The statement upon which appellant doubtless relies is a quotation from *Commonwealth* v. *Lowell Gas Light Co.* (12 Allen, 75), which reads in part as follows: " Indeed, in a broad, comprehensive and legitimate sense, the entire apparatus by which gas is manufactured and distributed for consumption throughout a city or town constitutes one great integral machine, consisting of retorts, station-meters, gas-holders, street-mains, service-pipes and consumers' meters, all connected and operating together, by means of which the initial, intermediate and final processes are carried on, from its generation in the retort to its delivery for the use of the consumers." This is far from saying that a gas main or a gas container is a place of business. The holder in question is merely an extension of the gas main, where the gas is cachéd during hours of light consumption and released during " heavy " hours as the needs of the consumers require. But if it be assumed that the plant in the town of Greenburgh is a " place of business," if its operation would be dangerous to life, or detrimental to health, or if it would generate any unwholesome, offensive or deleterious odors, gas, smoke, deposit or exhalations, then, it seems to me, the obtaining of a permit is necessary for its continuance. This brings us to an examination of the evidence.

The plaintiff called Benjamin A. Howes, who qualified as an expert chemical engineer. He testified that he had been retained by the plaintiff to make an examination of the defendant's plant. He described in detail the construction of the holder. He said

it was a steel tank or dish of cylindrical shape about 125 feet in diameter and 120 feet high. It is filled very nearly to its brim and contains some 3,000,000 gallons or 12,000 tons of water. He described the gaseous components of illuminating gas, and stated that, in addition, the gas " is likely to contain a small amount of poisonous gases, such as cyanides and hydrogen sulphide." He described hydrogen, one of the components, as " highly explosive when mixed with air " and " heated by a spark or a flame or anything to promote combustion." It was not poisonous in itself, and the great hazard lay in its displacing the oxygen in the air, and in its explosive character. He characterized carbon monoxide, another ingredient, as " the most dangerous industrial gas " and " the most feared of the war gases," being, even in dilution, highly dangerous to life and health. He described the " deadly " character of some of the other ingredients, and the disagreeable character of the rest.

The witness then directed his attention to the brick building, or boiler house, which is a part of the plant. It performed the function " not only of supplying the holder with gas, but of going through a process for compressing gas that doesn't go into the holder at all." It is about eighteen or twenty feet away from the holder, and has a brick smokestack, one hundred and twenty-five feet high, which is about thirty feet distant from the holder. It is about the same height as the holder when the " bell is all the way up," but much higher than the holder when the bell is down. The tank is about seventy-two feet from the Tarrytown road, and the compressor or boiler house is eight feet from the road. Close to the plant are many frame dwelling houses, and a public school is also in the vicinity.

The highly dangerous gases which contribute to form illuminating gas are harmless, of course, as long as they are confined in the holder, and the witness proceeded to tell the court the various ways in which it could escape from the holder. It could escape through leaks in the confining envelopes, through the water being deficient in the cups, and " underneath the whole telescope bell shape structure in case the holder is overfilled." Asked what might happen if the gas escaped, he said: " Why, any kind of an explosion or accident in the neighborhood. There are many kinds of explosions that might blow something right through that tank or into it." Having described the ways in which the gas could escape, the witness set himself to the task of showing the havoc it could create if it should escape. Lightning, for instance, " might set off any escaping gas," and there was " a record of lightning striking in the close vicinity." Of course, " there is any quantity

of ignitions from cigarettes and carelessly dropped matches," and when the wind is in the right direction the escaping gas might be " set off " by sparks from the motor of a passing trolley car.  A passing automobile might also be the cause; and a " sneaking current of gas might sneak and either be ignited from the power house chimney or from the boilers in the power house." These sneaking currents might also " travel a bit further and go into the kitchen of some of the houses  *  *  *  and be ignited from the kitchen fire." An airplane might try to make a landing on top of the tank and " might miscalculate and breach the tank and explode the gas." The machinery in the power house might bind or jam and cause friction that might set it off. He cited other instances, some of them being " recorded cases." There is " inevitably some escape of gas " inside the power house. A fire in one of the frame houses across the street would heat the tank, and, if the wind was right, would expand the gases. A fire in the vicinity could reach the boiler house and cause an explosion there. The tank might split open and turn its 12,000 tons of water loose, rushing down the valley and washing out " any buildings or any people that were in the way." The gases contained in the escaping water would poison and pollute the streams. The witness testified that there was more hazard in connection with a plant like this, where gas was merely stored, than in a plant where it was both manufactured and stored. The witness was asked by the court if he knew of any better plant than defendant's and he said he could not answer the question.

Charles A. Emerson, a civil engineer, called by the plaintiff, recited, in much briefer language than Mr. Howe, the hazards that might arise from the operating of such a plant, and stated how they might arise. The gist of his testimony was that illuminating gas is " inflammable, explosive, poisonous, and even in minute quantities has a disagreeable, nauseating odor." When collected in large quantities and " held in this container " it brings about a special hazard. " There is opportunity from the electric wiring, the passing automobiles, the manual operations in the boiler house in manipulating valves, firing the boilers and operating the other mechanical equipment which might cause accidents such as described in literature as having occurred in other places throughout the world." Asked the nature of those accidents, he said: " The majority of them seem to have been due to fire, the principal ones brought about through various causes, friction sparks, dropping matches, cigarettes, sparks from electric welding apparatus, and the like." He did not mean that the only hazard was from fire. and explosion. " Through careless or faulty operation there is

apt to be constant leakage of gas which becomes a nuisance to
nearby residents, and through personal idiosyncrasies perhaps is
liable to cause bodily discomfort and undue nervous condition and
worriment.  There is a possibility — I did mention the trolley
wires and passing machines, fires in the boiler plant, fires in the
home.  There is possibility of a break in the water container at
the bottom of that tank causing an indeterminable damage through
outrush of water.  If that water is discharged into the stream in
quantities beyond the capacity of such purifying arrangements as
there may be there it constitutes a pollution of the stream." He
thought the hazard was greatly increased because of the proximity
of the tank to frame houses and to a gasoline filling station, and
from the passing of automobiles on the adjacent highway.  Because
of the presence of the tank there was also danger of stream pollution.

John C. Olson, a professor in the Polytechnic Institute of Brook-
lyn, described the constituents of illuminating gas and their
poisonous properties.  The location of a gas tank close to a high-
way and to a boiler house in which the gas is compressed increases
the hazard.  There were numerous ways in which ignition might
occur in that particular locality.  There were concrete walks, and
men walking with nails in their shoes might produce a spark from
the concrete.  Then there were the electric lights " with their
short sparks which occur frequently."  He stated, as did the other
witnesses, the many causes of escaping gas and the consequences
of an escape.  He also stated how easy it would be for an explosion
to occur in the boiler house.  He then proceeded to tell the court
about the chemical effect of gas upon escaping water and " con-
sequent chemical effect of that water upon the surroundings."
The water, after being in the tank, is " not only bad smelling and
foul, but it also would combine poisonous constituents, and it
would be very deleterious if it were used for any consumption,
either man or animals."  It would pollute the streams, " with all
the attendant evils which come from pollution of streams."  It
would kill any life that might be in the streams.  The minimum
amount of air required to make gas ignite is five cubic feet of air
to one cubic foot of gas, and so it was " perfectly possible " for gas
to escape without doing any harm, and this for the reason that
there " wouldn't be sufficient to ignite when mixed with air."

George T. Macbeth, chief gas engineer of the defendant, said
his company supplied gas throughout a territory that included
Yonkers, Mt. Vernon, New Rochelle, Port Chester and White
Plains, besides a large number of incorporated villages.  Holders
located at places where gas is not manufactured are used for
" storing the gas in the light hours of consumption so it would be

available during the heavy hours of consumption." New Rochelle has two such holders, and Yonkers has three. The manufacturing plants are at Pelham, Rye, White Plains and Tarrytown. Gas from the Tarrytown manufactory is stored in the Greenburgh holder. The operation of the defendant company, in regard to the character and quality of the gas manufactured, is, he said, under the direction of the Public Service Commission, which makes not only regulations, but makes inspections to see that the regulations are carried out. The holder in question, in his opinion, would not generate offensive or deleterious odors, nor would it be hazardous to human life. Refuse, tarry products or waste would not be discharged from the holder into the stream in the vicinity, nor would it be discharged anywhere else. The overflow from the tank, as well as the water that falls upon the top of the tank in the form of rain or melted snow, " passed through a filter and is used in the boilers, and the filters are cleaned and refuse out of the filters is burned up under the boiler." There is not any opportunity for refuse or waste to reach a stream. The electric lights in the plant are equipped with vapor-proof globes, such as are used in marine and underwater works, " and even if a light goes out or breaks inside there is no chance of an explosion or ignition from such break or failure." From his experience with twenty of such holders the witness could say that exhausters and compressors are not liable to permit the escape of large quantities of gas, and are not liable to give out sparks. If any gas escaped from leaks in the compressor room it would go through the ventilation and would not reach the boilers. As to precautions against fire, the witness said that a three-inch main, with two hose connections, ran into the plant, and there were hose nozzles and other fire-fighting apparatus on the property.

William Cullen Morris, chief engineer of the Consolidated Gas Company of New York, testified that for more than twenty-five years he has had at least thirty gas tanks under his observation in New York city. During that time there had been only one failure in construction, and in that case the holder, under a test, had failed because of bad methods of workmanship. The methods then employed have long since been discarded. The single failure in operation had been that of one holder, which had been in use about thirty-eight to forty years. Because of a rip in the plates, the gas went out of the holder, but it dissipated in the atmosphere and there was no explosion.

Howard Bruce, president of the Bartlett-Heyward Company of Baltimore, the largest manufacturer of gas holders, testified that his company had designed the holder which is the subject of the

litigation.  In the seventeen years that he had been with the company he had not had a single instance of failure due to design, construction or operation.

Dr. Royal S. Copeland testified that while commissioner of health in New York city, he had inspected many gas holders. The Flower Hospital is directly across the street from large holders, and holders are also in proximity to the Willard Parker Hospital and the Roosevelt Hospital.  From the bed of the nearest patient in the Flower Hospital the gas tank was only sixty feet away. There were from forty to sixty gas tanks in New York city.  His opinion was that such holders, properly built and operated, are not dangerous to life or health.  Properly constructed and operated, modern tanks are free from offensive odors.  In the morning of the day on which he testified, he went around the holder in question and found no odor.  He was asked if he would deliberately " put a gas tank in a mess of frame buildings," and he replied: " I think it is a perfectly safe location."  The location in question, he said, was " an admirable location."  He knew there was a tendency all over the world to take gas tanks out of residential and business districts, but that was only for a cosmetic reason, by which he meant that " a gas tank spoils the landscape and interferes with the outlook from homes, and so far as possible in my judgment they should be placed in a locality where there would be as little impairment of beauty, and so forth, because of the effect on property values."

William H. Gartley, chief engineer of the Philadelphia Gas Company, with forty years' experience in the maintenance of gas holders, testified that he could testify to but one failure.  That was in connection with a holder belonging to the Point Breeze Gas Works in Philadelphia, which failed " because it was not being used for the storage of illuminating gas."  The holder, at the time, was filled with unpurified oil gas.  The amount of sulphurated hydrogen in that gas " was far and away beyond anything that illuminating gas would hold."  The rivets corroded and the top of the holder came off.  The gas " poured down over the side of the holder as a waterfall," spread out over the territory and ignited.  " It was a fog.  It had very little relation to illuminating gas.  It was more vapor than it was gas."  He said the corrosion was due to the fact that the gas was unpurified.

I think the testimony sustains the conclusion that, assuming the holder, or the premises where it is situate, to be a place of business, it is not dangerous to life, nor detrimental to health, nor does it generate unwholesome, offensive or deleterious odors, gas, smoke, deposit or exhalations: nor are any offensive or

deleterious waste substances, gas-tar, sludge, refuse or other injurious matter allowed to accumulate upon the premises or to be thrown into public waters, streams or public place. Its maintenance does not violate the provisions of either section 174 or 175, and it is not necessary to procure a permit under the provisions of section 175. As to the first action I think, therefore, that the decision of the trial court must be sustained.

The second cause of action was brought because the plaintiff was not sure of its ground as to the first. Of this action the trial judge, in his findings, says: " That the said ordinance of March 6th, 1924, was adopted primarily to prevent the completion and operation of the defendant's gas holder and the other buildings in suit connected therewith, and to provide the basis for this action; the contract for the structure was let by the defendant in May, 1923; the work of construction began in August of that year, and the first notice of protest from the Town Board was received by defendant on November 13th of the same year. The foundation had then been laid and many thousands of dollars expended in the work. * * * When the ordinance which forms the basis of the second action was adopted on March 6th, 1924, the holder was substantially complete. The second action was commenced in September, 1924, after the holder was complete and in operation."

The ordinance reads:

" No gas plant for the manufacture of gas, nor any holder or container of gas, shall be located so near a parkway, a State or county highway, a public school or a residential district within the town limits as to be dangerous to life and limb in the event of explosion or which shall increase the fire hazard of adjacent or near buildings, or so close to homes or residences as to impair their light, air and free access or increase their fire hazard or change the residential character of the section in which such homes or residences are situate. To that end, no such plant or holder shall be hereafter erected, or if already erected, continued or extended, without a permit from the Board of Health of the Town of Greenburgh granted upon the petition of the owner or operator thereof, after due hearing and notice to all persons affected or to be affected thereby.

" If any such plant or holder shall have been heretofore erected and its continuance shall be in violation of the foregoing provision, it shall be deemed to be a public nuisance, notwithstanding the public service character of such plant or holder, and the Town Board shall be authorized to bring suitable court proceedings for the abatement thereof."

The ordinance provides that no gas holder or container shall

be erected so close to " homes or residences as to impair their light, air and free access," and that when a holder or container has already been so erected it shall not be continued or extended without a permit from the board of health. It is patent that the holder in question, because of its height and diameter, does impair light to some extent, and so would come within this provision of the ordinance. But I regard the provision as unconstitutional, being discriminatory in that it singles out gas holders as the only kind of structure which, impairing light, cannot continue without a permit. Other structures, such as factories, churches or apartment houses, would also impair light, but they are not included within the inhibition.

There is evidence to sustain the finding " that the plaintiff has failed to establish by a fair preponderance of evidence the dangerous character of the structures or their equipment, or any hazard or menace to life or property from their operation." But even though the plaintiff has failed to prove these things, I think this far-reaching ordinance brings the holder in question within its inhibition. The ordinance does not stop at prohibiting the erection, or the continuing without a permit, of a holder or container that is dangerous to life and limb; it goes further and extends the inhibition to any holder or container, so situated, as shall be dangerous to life and limb *in the event of explosion.* Manifestly, any gas tank and every gas tank would be dangerous to life and limb in the event of explosion. So, therefore, the ordinance in effect provides that a gas holder already erected near a parkway, or a highway, or a public school, or a residential district within the town limits, shall not be continued unless a permit for its continuance shall be issued by the board of health. This makes the board of health the sole judge of whether defendant's holder shall be continued although its construction was commenced before the ordinance was passed and although the evidence adduced at the trial shows that it is not dangerous to life or limb or health.

The respondent calls attention to the fact that it is a public service corporation engaged in the manufacture, sale and distribution of gas to a number of cities, towns and villages in Westchester county; that the location of its various buildings, pumping stations and storage holders is governed by the demand for gas in the various sections of the territory which it serves, and that the Greenburgh holder and the pumping station connected with it, in the location where they are placed, are absolutely necessary to the supply of gas to the surrounding territory, known as the White Plains district, because of increased demands from the

18

residents. The contention of the respondent is that the fact that it is a public service corporation and is supplying, as it is required by law to do, the inhabitants of this large district with an article which has come to be regarded as a public necessity, has an important bearing on the reasonableness of local ordinances which would seriously interfere with the carrying on of its business. In other words, the defendant says that an attempt by a local board to compel the removal or even to prevent the erection or continuance of a gas holder, requires a good deal more to justify it than would an attempt by it to remove a slaughter house or a garage or a gasoline filling station.

The defendant further contends that the obvious reason for the second ordinance, and for the litigation which ensued, is that persons owning property in the neighborhood would rather have the holder near the property of somebody else; that the desire is a natural one, and that it exists in the case of many public necessities, such as railroad tracks, fire-engine houses, telegraph poles and the like. The defendant also claims that a local board of health has not the power, in the limited authority given to it by the Public Health Law, to enact legislation to carry out the wishes of local inhabitants in matters of this kind.

I think this reasoning is sound and that the ordinance is an unwarranted exercise of the police power.

The final judgment should be affirmed, with costs.

Young and Kapper, JJ., concur; Kelly, P. J., concurs in a separate memorandum; Lazansky, J., concurs in the result.

Kelly, P. J. (concurring). I concur with Mr. Justice Manning for the reason that so far as plaintiff's action is based upon allegations that defendant's storage gas tank and plant constitute a nuisance dangerous to life or detrimental to health, and that its maintenance is in violation of section 174 or 175 of the ordinance of February, 1923, the learned trial justice has found as matter of fact upon competent evidence that defendant's gas holder and plant do not constitute a nuisance. A permit from the board of health is required when a manufactory or place of business is conducted which is " dangerous to life or detrimental to health, or where unwholesome, offensive or deleterious odors, gas, smoke, deposit or exhalations are generated." How a board of health could in any case issue a permit to carry on such a public nuisance as is described in the ordinance is not very clear, but the trial justice has found that these offensive conditions do not exist. As to the second cause of action set out in the complaint under the ordinance adopted in March, 1924, and having in mind the findings

of fact already referred to, the defendant having erected its gas holder and plant, at an expenditure of many thousands of dollars, its structure being substantially completed prior to the adoption of the ordinance, I cannot see how the town board by this *ex post facto* legislation can prohibit the defendant from carrying on its business. Gas companies have carried on business for a generation and are carrying on business in the cities as well as in the suburban districts in this State. The supply of gas for light and heat is one of the necessities of the people in the city and the country. Conducted in a proper manner it cannot be said to be a nuisance. If improperly or negligently conducted it may become a nuisance, but the same is true of many other industries. That a gas holder may not be a welcome structure in a given neighborhood from the æsthetic point of view, hardly justifies an ordinance prohibiting the defendant from carrying on an established business otherwise lawful.

Final judgment affirmed, with costs.